**CONNECTICUT STATE DEPARTMENT OF SOCIAL SERVICES, et al.**

v.

**Tommy THOMPSON**

**No. CIV.A.3:99 CV 2020 S.**

United States District Court, D. Connecticut.

Sept. 9, 2002.

Order Implementing Ruling Jan. 3, 2003.

Order Denying Partial Reconsideration Feb. 20, 2003.

Richard J. Lynch, Maite Barainca, Rosemary Miller McGovern, Attorney General's Office, Hartford, CT, Brad S. Plebani, Judith Stein, Gill W. Deford, Willimantic, CT, Keith B. Gallant, Attorney, Cummings & Lockwood, New Haven, CT, for Plaintiffs.

John B. Hughes, Patrick F. Caruso, U.S. Attorney's Office, New Haven, CT, Hannah A. Stires, Richard Robert Brown, Lisa Bornstein, Martha Hirschfield, U.S. Department of Justice, Washington, DC, for Defendant.

### RULING ON THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

UNDERHILL, District Judge.

The Connecticut Department of Social Services ("DSS"), its Commissioner, Patricia Wilson–Coker (the "Commissioner"), and a statewide class of individuals who are dually eligible for certain Medicare[1] and Medicaid[2] benefits to cover home

---

**1.** Medicare is a federally funded and administered program of health insurance for the nation's elderly and disabled who are covered by Social Security. Title XVIII of the Social Security Act, 42 U.S.C. § 1395, et seq. This case involves only Part A of Medicare, pursuant to which beneficiaries are entitled to certain hospital, extended care (i.e., nursing home care), home health, and hospice services. Home health care includes part-time or intermittent skilled nursing services and home health aide services to individuals confined to home and who are in need of skilled nursing services on an intermittent basis or in need of skilled therapy services under a plan of care prescribed and periodically reviewed by a physician. This case does not involve Part B of Medicare, which establishes a voluntary program of supplemental medical insurance covering physicians' care and other health services, including home health services not covered under Part A.

**2.** Medicaid is a program that pays for certain health care expenses incurred by the impoverished elderly and disabled. Title XIX of the Social Security Act, 42 U.S.C. § 1396, et seq. Medicaid is partly funded by the federal gov-

health care expenses,[3] allege that the Secretary of the United States Department of Health and Human Services[4] ("the Secretary") has failed to comply with certain procedural requirements of the Medicare regulations. Specifically, the plaintiffs allege that the Secretary, through a financial intermediary, United Government Services of Wisconsin ("UGS"), has failed to provide written, timely and accurate initial coverage and reconsideration determinations to beneficiaries in Connecticut who are receiving home health care services covered by Medicaid, and who have sought reimbursement for such expenses from Medicare by filing a request with UGS. Plaintiffs further allege that the Secretary's failure to comply with the Medicare regulations is so severe as to constitute a violation of plaintiffs' procedural due process rights as guaranteed by the Fifth Amendment to the United States Constitution.

The Secretary has timely answered plaintiffs' complaint, and has admitted the majority of plaintiffs' substantive factual allegations. The Secretary argues, however, that plaintiffs are not entitled to judgment in their favor. Specifically, the Secretary argues that this court does not have subject matter jurisdiction over plaintiffs' claims and that plaintiffs have failed to exhaust their administrative remedies prior to instituting this suit. The Secretary also disputes that UGS's procedures for handling plaintiffs' requests are contrary to the various regulations upon which

plaintiffs rely. Finally, the Secretary avers that UGS has performed its delegated functions properly, that the Secretary has undertaken lawful supervision of UGS, and that any supervisory action or inaction of UGS by the Secretary is purely within his discretion and is not subject to judicial review.

The parties are in agreement that there are no disputed issues of material fact and that the sole issues in controversy are legal issues capable of resolution by the court on summary judgment. To that end, the parties have filed cross-motions for summary judgment on all issues raised in the Amended Complaint. For the following reasons, the court concludes that plaintiffs are entitled to summary judgment in their favor on all of their claims except their claim that the Secretary has failed to ensure that UGS issues sufficiently timely and accurate notices of initial determination and reconsideration decisions. The Secretary is entitled to summary judgment in his favor on those claims.

## A. BACKGROUND

DSS is the Connecticut state agency responsible for administering the state's Medicaid program. DSS is required by law to seek reimbursement for health care expenditures it makes for Medicaid beneficiaries from any other entity legally obligated to make such payments, including the Medicare program. Medicaid benefi-

ernment and partly funded by the states, and is administered by each participating state. One benefit that states are required to provide under their Medicaid programs is the provision of home health care services.

**3.** On February 28, 2000, the court certified the plaintiff class, which consists of all residents of Connecticut: (1) who are, have been, or become simultaneously eligible for both Medicare and Medicaid coverage; (2) whose home health care providers have had or have UGS as their fiscal intermediary; and (3) for

whom requests for an initial determination and/or for reconsideration of an initial determination for Medicare coverage of home health care services have been filed or are filed. The class representatives are Philip Myrun and Confessora Santiago.

**4.** At the time this lawsuit began, Donna Shalala was Secretary of the Department of Health and Human Services. Pursuant to Federal Rule of Civil Procedure 25(d), Tommy Thompson, the present Secretary, was substituted as the named defendant.

ciaries are thus required by law to assign to DSS any rights that they may have to seek payment for home health care services they have received, including any right the beneficiaries may have to seek payment from the Medicare program. DSS is thus subrogated to Connecticut Medicaid beneficiaries' rights to seek administrative review of a denial of Medicare coverage by a health care service provider.

In furtherance of its duty to seek reimbursement for Medicaid expenditures, including reimbursement from Medicare, DSS has established a "Third Party Liability Program." Specifically, DSS has hired the Center for Medicare Advocacy Inc. ("CMA"), a nonprofit public interest law firm, to seek coverage from Medicare for home health care services for which payment has already been made under Medicaid. In these cases, the health care service provider[5] has determined that Medicare coverage is not appropriate, and so payment has been made under Medicaid. CMA pursues the beneficiaries' rights to seek review of the provider's determination of no coverage. The present lawsuit challenges UGS's handling of CMA's pursuit of this right of review. Specifically, CMA challenges UGS's handling of CMA's requests for initial coverage determinations and UGS's requests for reconsideration from adverse initial determinations.

### 1. The Administrative Process

HHS does not itself directly handle claims for coverage of home health care services under Medicare. Rather, the Secretary acting through the HHS division known as the Health Care Financing Authority ("HCFA"),[6] has entered into contracts with private entities (typically private insurance companies), known as fiscal intermediaries, to act as HHS's agent in the initial stages of Medicare coverage determinations. More specifically, initial determinations and reconsideration requests on claims for Part A home health care services are handled by one of four fiscal intermediaries, which HCFA has designated as a "regional home health intermediaries" ("RHHI"). HHAs can submit claims to the RHHI responsible for the region either in which the HHA provided the services to the beneficiary[7] or in which the HHAs' corporate headquarters are located.[8]

If an HHA determines that home health care services provided to a beneficiary are covered by Medicare, it simply submits a claim for payment to the RHHI. The RHHI then determines if the claim submitted by the HHA is covered by Medi-

---

5. Home health care services are provided by agencies known as home health agencies ("HHAs"), which have entered into agreements with the Secretary to provide such services.

6. During the pendency of these motions, HCFA was renamed "the Center for Medicare and Medicaid Services." For ease of reference, the court will continue to refer to HCFA.

7. The term "beneficiary" is defined by the regulations as "someone who is *entitled* to Medicare benefits." 42 C.F.R. § 400.202 (emphasis added). Persons such as the plaintiffs, who are seeking a determination wheth-

er they are entitled to benefits, would not normally be called beneficiaries. Nevertheless, following the parties' practice in this case, the court will refer to individuals who are seeking a determination of coverage as "beneficiaries."

8. UGS is not the RHHI for the HCFA region encompassing Connecticut. Rather, it is the RHHI for the region in which are located the corporate headquarters of two HHAs that provide home health care services to Connecticut residents. Associated Hospital Services of Maine ("AHS") is the RHHI for the region encompassing Connecticut, and therefore is responsible for majority of claims filed by HHAs providing services in Connecticut.

care. If, however, the HHA makes a determination that the service is not covered under Medicare, it must notify the beneficiary that the service is not covered. If the beneficiary disagrees with the provider's determination, he or she may submit a request for payment either to the provider or directly to the fiscal intermediary. The provider will then submit a claim at the request of the beneficiary, known as a "demand bill."

Once the fiscal intermediary receives a claim from a HHA, or a request for payment from a beneficiary, it is required to make an initial determination concerning coverage. There is no regulatory time frame within which this initial determination must be made.[9] Once made, however, the RHHI must notify both the beneficiary and the provider in writing of its initial determination. This notification is known as a "notice of initial determination." The parties vigorously contest whether the regulations also require the RHHI to provide a copy of the notice of initial determination to a beneficiary's representative.

The RHHI's initial determination is binding unless the beneficiary files a written request for reconsideration. Upon the filing of a request for reconsideration, the RHHI does an independent, de novo review of the claim. The RHHI is required to provide written notice of the disposition of the request for reconsideration both to the beneficiary and to his or her representative. Disposition of a request for reconsideration is binding unless the claim in-volves more than $100, and the beneficiary requests a hearing before an administrative law judge within sixty days of the reconsideration decision. A beneficiary is then entitled to a hearing before the Department Appeals Board. Finally, for claims in which more than $1,000 is at issue, judicial review in the United States District Courts is available after a final decision of the Department Appeals Board.[10] A beneficiary must obtain a final decision at each level of administrative review before obtaining review at the next administrative level.

### 2. UGS's Practices

Prior to December 1997, UGS provided notice of an initial determination both to the beneficiary and to his or her representative using a document known as the "Notice of Medicare Claim Determination."

After December 1997, UGS began sending a form labeled "Medicare Summary Notice" ("MSN") instead of the Notice of Medicare Claim Determination. In addition, the MSN was sent only to the beneficiary, and not to his or her representative. UGS sent CMA, the representative for the majority of Connecticut dually eligible beneficiaries, magnetic tape cartridges with electronic information about claims processed during the preceding month. UGS also, approximately annually, sent CMA summary spreadsheets containing aggregate information on claims processed by UGS over a longer period of time than the monthly electronic transmissions. UGS

---

9. Congress recently set a 45–day limit for making initial determinations, which will become effective in October 2002. That time limit will apply only to "clean claims" not "other claims" such as demand bills.

10. The filing of a request for determination is distinct from the filing of what is known as a "statement of intent." A statement of intent is not a claim, but a placeholder for the later filing of a proper claim within a six-month period following the date of notice that the statement of intent was received. Intermediaries not responsible for identifying the provider or requiring that the provider submit a claim. Rather, the individual filing a statement of intent is required to ensure that a complete claim is timely submitted. No initial determination need be issued after the filing of a statement of intent. *See* 42 C.F.R. § 424.45.

entered into an agreement with CMA whereby the sixty-day period for seeking reconsideration of an initial determination was triggered not by the issuance of the MSN, but rather by CMA's receipt of the monthly summary spreadsheets. Specifically, CMA had sixty days from the date it acknowledged receipt of the monthly report to seek reconsideration of any claim whose denial or rejection first appeared on that monthly report.

## B. SUBJECT MATTER JURISDICTION AND EXHAUSTION OF ADMINISTRATIVE REMEDIES

Plaintiffs assert several bases for subject matter jurisdiction in their Amended Complaint.[11] First, plaintiffs assert jurisdiction under 28 U.S.C. § 1331 ("Section 1331"), which bestows upon "the district courts ... original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Plaintiffs also assert jurisdiction under 28 U.S.C. § 1361 ("Section 1361"), which grants "the district courts ... original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Finally, plaintiffs assert jurisdiction under 42 U.S.C. § 1395ff(b), which permits judicial review "to the same extent as is provided in" 42 U.S.C. § 405(g) ("Section 405(g)"). Section 405(g) provides, in pertinent part, that:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States District Court for the District of Columbia.

The Secretary has challenged plaintiffs' purported bases for subject matter jurisdiction. The court also, of course, has an independent duty to determine the existence of subject matter jurisdiction. *See Da Silva v. Kinsho Intern. Corp.*, 229 F.3d 358, 361 (2d Cir.2000) (It is the "obligation of a court, on its own motion, to inquire as to subject matter jurisdiction and satisfy itself that such jurisdiction exists.") (*citing Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Accordingly, the court will separately examine each purported basis for subject matter jurisdiction.

### 1. Federal Question Jurisdiction Under Section 1331

■ There is no dispute that plaintiffs' claims "arise under" federal law: namely

11. In the section of the Amended Complaint entitled "Jurisdiction and Venue," plaintiffs assert that they "seek a declaration of rights pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202." (Am. Compl. at ¶ 2.) The Declaratory Judgment Act is not, however, an independent source of subject matter jurisdiction. *See Concerned Citizens of Cohocton Valley, Inc. v. New York State Dept. of Environmental Conservation*, 127 F.3d 201 (2d Cir.1997) ("It is settled law that the Declaratory Judgment Act ... does not enlarge the jurisdiction of the federal courts, *see, e.g., Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); *Albradco, Inc. v. Bevona*, 982 F.2d 82, 85 (2d Cir.1992), and that a declaratory judgment action must therefore have an independent basis for subject matter jurisdiction, *id.*").

the Medicare Act and its associated regulations. The Secretary argues, however, that Section 1331 jurisdiction is unavailable because plaintiffs' claims must be channeled through the administrative procedures set forth in the Medicare Act and its associated regulations. Specifically, the Secretary, relying on *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 5, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000) (*"Illinois Council"*), asserts that "[t]he availability of judicial review under the Medicare Act precludes federal question jurisdiction." In *Illinois Council*, the Supreme Court held that 42 U.S.C. § 405(h) ("Section 405(h)"),[12] as incorporated into the Medicare Act by 42 U.S.C. § 1395ii, barred federal question jurisdiction over a challenge by an association of nursing homes to certain of the Secretary's Medicare regulations. *Id.* at 5, 120 S.Ct. 1084. The *Illinois Council* court held that the association was required to pursue its claims through the administrative review procedures, set forth in 42 U.S.C. §§ 1395cc(h), (b)(2)(A); §§ 405(b), (g) (incorporated by § 1395ii), allowing for appeals from the Secretary's termination of, or a refusal to renew, a provider agreement for failure to comply with the terms of agreement or the Medicare statutes and regulations. As such, the plaintiff association of nursing homes could not rely upon Section 1331's grant of federal question jurisdiction; rather their claims were channeled by Section 405(h) through the administrative processes set forth in Section 405(g).

As a preliminary matter, there can be little doubt that the *Illinois Council* holding is not applicable to plaintiffs' claim that UGS's procedures are unlawful because plaintiffs do not receive any decision on certain requests for initial determination. The *Illinois Council* court explicitly held that Section 405(h) is not a bar to jurisdiction where the result would be no review at all of a plaintiff's claims. *Illinois Council*, 529 U.S. at 19, 120 S.Ct. 1084; *see Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 675, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986) (*"Michigan Academy"*); *Furlong v. Shalala*, 238 F.3d 227 (2d Cir.2001) (*"Furlong II"*); *DeWall Enterprises, Inc. v. Thompson*, 206 F.Supp.2d 992 (D.Neb.2002). That is, however, the precise import of plaintiffs' claim; they do not receive an initial determination from which they can seek administrative and, if necessary, judicial review. Accordingly, the court concludes that it has jurisdiction under Section 1331 to hear plaintiffs' claim that they receive no initial determination on certain requests for an initial determination.

Less clear, however, is whether, after *Illinois Council*, plaintiffs remaining claims are subject to the restrictions of Section 405(h), or if the court has federal question jurisdiction under Section 1331. The plain language of Section 405(h) applies only to those claims that seek to "recover on [a] claim arising under" the Medicare Act. Plaintiffs' claims certainly are not straightforward "amount determinations" such that they fall squarely within Section 405(h). Rather, they appear more like "methodology" claims which, prior to *Illinois Council*, would have been exempted from Section 405(h)'s reach under *Michigan Academy*. Although "the status of the amount/methodology distinction after *Illinois Council* is somewhat unclear," *Furlong II*, 238 F.3d at 233, the weight of post-*Illinois Council* authority seems to indicate that federal question jurisdiction

---

**12.** Section 405(h) provides, in pertinent part, that "[n]o action against the United States, the [Secretary], or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28, United States Code, to recover on any claim arising under this title." 42 U.S.C. § 405(h).

under Section 1331 is unavailable for plaintiffs' remaining claims. *Compare Cathedral Rock of North College Hill, Inc. v. Shalala,* 223 F.3d 354 (6th Cir.2000); *Home Care Assn. Of Amer., Inc. v. United States,* 229 F.3d 1163 (10th Cir.2000) (unpublished disposition), *with Visiting Nurses Ass'n of Southwestern Indiana, Inc. v. Shalala,* 213 F.3d 352, 357 n. 7 (7th Cir. 2000) (distinguishing *Illinois Council* and holding that Section 405(h) was inapplicable where parties did not challenge the regulatory scheme, but differed in their interpretation of the applicable statute). In any event, the court need not decide this thorny issue because, as set forth below, the court concludes that it has subject matter jurisdiction under both Section 405(g) and Section 1361.

### 2. Jurisdiction under the Medicare Act

Plaintiffs have also asserted jurisdiction under Section 405(g). The Secretary argues that plaintiffs may seek judicial review of their claims pursuant to Section 405(g), incorporated into the Medicare statutes by 42 U.S.C. § 1395ff(b), only once they have received a "final decision" rendered "after a hearing," which they have not done. Importantly, however, the Secretary concedes that plaintiffs have presented their claims to him and, there-

fore, that the alleged failure to exhaust is not purely jurisdictional. (Def's Opp. Memo at 4.).[13]

Plaintiffs do not contend that, as to each individual request for initial determination or reconsideration at issue, they have obtained a "final decision" "after a hearing." The parties also do not dispute that the Secretary himself has not, as he might have, waived Section 405(g)'s exhaustion requirement. Rather, the parties dispute whether the court should waive plaintiffs' need to exhaust the procedures set forth in Section 405(g). If so, jurisdiction lies under Section 405(g). If not, plaintiffs must either exhaust their administrative procedures, or demonstrate the existence of an alternative source of subject matter jurisdiction.

It is well settled that "exhaustion is the rule, waiver the exception." *Pavano v. Shalala,* 95 F.3d 147, 150 (2d Cir.1996), *quoting Abbey v. Sullivan,* 978 F.2d 37, 44 (2d Cir.1992). Waiver is, however, appropriate when the following circumstances are present: "the challenge is collateral to the demand for benefits, the exhaustion of remedies would be futile, and enforcement of the exhaustion requirement would cause the claimants irreparable injury." *State of New York v. Sullivan,* 906 F.2d 910, 918

---

**13.** The Secretary's failure to exhaust argument is limited "to the extent plaintiffs complain that UGS' decisions on initial determination or reconsideration requests are inaccurate. A. Compl. ¶ 72, 75." (Def's Memo at 26.). In the cited paragraphs of the Amended Complaint, plaintiffs summarily aver that the Secretary failed to require UGS "to provide timely, written and accurate initial determinations," and "reconsideration decisions." Thus, the Secretary's exhaustion argument is limited to plaintiffs' claims that the Secretary failed to require UGS to provide "timely, written" initial determinations and reconsideration. Less clear, however is which of plaintiffs' specific claims challenge the "accuracy" of the initial determinations and reconsideration decision, and which do not. There can be little doubt that plaintiffs' claim that UGS renders inaccurate decisions falls squarely within the "accurate" moniker. Less clear is whether plaintiffs' claim that UGS's initial determinations do not "state in detail" the basis for the determination as required by 42 C.F.R. § 405.702, attacks the "accuracy" of UGS's decisions. In any event, plaintiffs claims that UGS does not issue initial determination decisions when the provider does not file a claim, does not render timely decisions, and does not send a copy of the initial determination to the beneficiary's representative, clearly do not fall under the "inaccurate" rubric.

(2d Cir.1990). "No one element is critical to the resolution of the issue; rather, a more general approach, balancing the competing considerations to arrive at a just result, is in order." *Id.* Balancing the foregoing concerns, waiver is appropriate in this case.

### a. Plaintiffs' claims are collateral to their claims for benefits.

Plaintiffs' claims are the very paradigm of collateral claims. In *Bowen v. City of New York,* 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986) ("*City of New York*"), the Supreme Court upheld the district court's waiver of exhaustion of the procedures set forth in Section 405(g). Specifically, the Supreme Court relied on the fact that "[t]he class members neither sought nor were awarded benefits in the District Court, but rather challenged the Secretary's failure to follow the applicable regulations." *Id.* at 483, 106 S.Ct. 2022. As in *City of New York,* the plaintiffs in this case do not seek an award of benefits, either directly or indirectly. Rather, plaintiffs challenge the Secretary's failure to follow his own regulations in the process of handling their requests for initial determination and reconsideration decisions. Indeed, if plaintiffs were to prevail on each and every claim asserted in this action, there would be no guarantee that any particular plaintiff would receive, or would even be more likely to receive, any benefits previously denied him or her, or any future benefits. Accordingly, the court concludes that plaintiffs' present claims are collateral to their claims for benefits. *See also Eldridge,* 424 U.S. at 330, 96 S.Ct. 893 (plaintiff's challenge to constitutionality of administrative procedures for terminating social security disability benefits was "entirely collateral to his substantive claim of entitlement."); *Goodnight v. Shalala,* 837 F.Supp. 1564, 1574 (D.Utah 1993) (relying on City of New York; claims collateral because plaintiffs did not seek "a

judgment awarding them disability benefits," or "to correct inadvertent errors or occasional mistakes that ordinarily occur," but rather a "vindication of [the plaintiffs'] right to fair procedures at the initial and reconsideration stages of the determination process."); *White v. Sullivan,* 1991 WL 315124 (D.Vt. Oct.15, 1991) ("An issue is collateral if, in the event it is decided in the claimant's favor, the Secretary nevertheless retains the discretion to apply the law and make the final determination as to the amount of benefits a claimant receives. Therefore, courts may waive the exhaustion requirement in order to ensure that the Secretary applies only valid standards in making his decisions, but may not waive it to second-guess his decisions in cases where he applies the proper law.") (synthesizing cases).

The Secretary mistakenly asserts that plaintiffs' present claims are inextricably intertwined with their claims for benefits and are therefore not collateral. Specifically, the Secretary, seizing on language in *Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984), and *Pavano v. Shalala,* 95 F.3d 147 (2d Cir.1996), argues that plaintiffs claims cannot be collateral because they challenge the Secretary's application of admittedly valid regulations. The Secretary correctly concludes that plaintiffs in this action do not challenge the validity of the Secretary's regulations, but rather the interpretation and application of the regulations. The Secretary is also correct in noting that, in *Pavano,* the court held that the "[p]laintiffs were not challenging the validity of agency regulations, but challenging the application of regulations to them," and that "[t]he policies favoring exhaustion are most strongly implicated by actions [such as the one at bar] challenging the application of concededly valid regulations." *Pavano,* 95 F.3d at 150 (brackets in original). The Secretary, however, reads too much into the *Pavano*

holding when concluding that plaintiffs' claims in this case are not collateral. Properly read, *Pavano* holds that a claim is not collateral where an individual challenges the application of a regulation to his or her specific claim for benefits, i.e., plaintiff "is not seeking relief other than that sought in the administrative hearing," *id.*, as opposed to challenging the Secretary's system-wide interpretation and application of a regulation.

The seminal decision in *City of New York* aptly demonstrates this distinction. Specifically, the court noted that that "case [was] materially distinguishable from one in which a claimant sues in district court, alleging mere deviation from the applicable regulations *in his particular administrative proceeding.*" *Id.* at 484, 106 S.Ct. 2022 (emphasis added). In such a case, any alleged error would be "fully correctable upon subsequent administrative review since the claimant on appeal will alert the agency to the alleged deviation." *Id.* at 484–85, 106 S.Ct. 2022. The court further explained that the plaintiffs in that case, however, stood "on a different footing from one arguing merely that an agency incorrectly applied its regulation," because "the District Court found a systemwide, unrevealed policy that was inconsistent in

critically important ways with established regulations." [14] *Id.* at 485, 106 S.Ct. 2022. In addition, the challenged policy did not "depend on the particular facts of the case before it . . . ." *Id.* Accordingly, the plaintiffs' claims were held to be collateral.

Similarly, plaintiffs in this case do not simply aver that, in denying them benefits, the Secretary misapplied an agency regulation. Rather, plaintiffs attack several of the Secretary's alleged system-wide failures to follow his own regulations. In other words, plaintiffs are not challenging the lawfulness of particular denials of benefits, and seeking to reverse those decisions. Indeed, they do not challenge any specific benefit determination, or class of such determinations, as wrongful.[15] Rather plaintiffs challenge the manner in which benefit determinations are communicated to beneficiaries. Thus, at the core of their claims, plaintiffs are "seeking relief other than that sought in the administrative proceeding." *Pavano*, 95 F.3d at 150.[16]

### b. Plaintiffs' will suffer irreparable harm if exhaustion is not waived.

The Secretary argues that plaintiffs will not suffer irreparable harm if they are required to exhaust their administrative

---

**14.** In this case, unlike *City of New York*, the Secretary's policies were not secret. That is, however, a distinction without a difference. The existence of a secret policy is not a prerequisite to waiver. *See, e.g., Schoolcraft v. Sullivan*, 971 F.2d 81, 85 (8th Cir.1992).

**15.** Plaintiffs' claim that the Secretary fails to ensure that UGS issues accurate decisions comes closest to challenging benefit determinations. However, even assuming that claim is not collateral to plaintiffs' benefits claims, the court has determined that the Secretary is otherwise entitled to summary judgment.

**16.** The Secretary also cites to *Heckler v. Ringer*, 466 U.S. 602, 614, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984), in support of the proposition that plaintiffs' claims are "inextricably

intertwined" with their claims for benefits. (Def's Am. Opp. Memo. at 7). The cited portion of *Heckler*, however, concerns whether the claims in that case were channeled by Section 405(h) in the first instance, not whether waiver of the procedures set forth in Section 405(g) was appropriate. Moreover, in the portion of the *Heckler* opinion that did concern waiver of Section 405(g), the court specifically noted that it had "previously explained that the exhaustion requirement of § 405(g) consists of a nonwaivable requirement that a 'claim for benefits shall have been presented to the Secretary,' *Mathews v. Eldridge*, 424 U.S. at 328, 96 S.Ct. 893, and a waivable requirement that the administrative remedies prescribed by the Secretary be pursued fully by the claimant." *Id.* at 617, 104 S.Ct. 2013.

remedies because the very fact that they are dually eligible means that they have already received home health care services and that such services have been paid for by Medicaid. The Secretary further dismisses as inchoate the possibility that plaintiffs' estates may be diminished after their future deaths by actions of co-plaintiff and subrogee DSS. As such, the Secretary avers, the only real harm to plaintiffs is the mere inconvenience and expense of protracted administrative hearings, which cannot constitute irreparable harm. Even assuming, however, that the only cognizable harm to plaintiffs is the burden of resorting to the administrative processes, waiver would nevertheless be appropriate.

■ There is little doubt that ordinarily "the mere trouble and expense of defending an administrative proceeding is insufficient to warrant judicial review of the agency's action prior to the conclusion of the administrative proceeding." *Abbey v. Sullivan,* 978 F.2d 37, 46 (2d Cir.1992) (*quoting Central Hudson Gas & Elec. Corp. v. EPA,* 587 F.2d 549, 559 (2d Cir. 1978)) (citation omitted). Still, there are exceptions to this rule. Specifically, "[i]n the Medicare context, the 'other factors' that might justify waiving the exhaustion requirement have been examined variously under the rubric of futility or irreparable harm." *Id.* Thus, "[f]or example, if requiring costly and time-consuming exhaustion of the administrative process would be demonstrably sterile, then the exhaustion requirement may be waived." *Id.* As discussed in detail in the section immediately following, plaintiffs would be irreparably harmed if they were forced to exhaust their administrative remedies because exhaustion would be futile. Furthermore, the court is mindful of its duty to "be especially sensitive to this kind of harm where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the procedure they should have been afforded

in the first place." *City of New York,* 476 U.S. at 484, 106 S.Ct. 2022; *see also Tataranowicz v. Sullivan,* 959 F.2d 268, 274 (D.C.Cir.1992) (irreparable harm where the "Secretary gives no reason to believe that the agency machinery might accede to plaintiffs' claims."). Accordingly, plaintiffs would suffer irreparable harm absent waiver.

c. **Exhaustion would be futile—it would not serve the purposes of the exhaustion requirement.**

The Supreme Court has instructed that "[e]xhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review." *Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). The Secretary asserts that exhaustion would not be futile because plaintiffs have available to them, and indeed in some instances have successfully availed themselves of, administrative and judicial review of their individual claims.

Again, the court takes no issue with the Secretary's statement of the general principle (i.e., that where claims can be satisfied by resort to the administrative proceedings, the administrative proceedings are not futile). *See, e.g., Pavano,* 95 F.3d at 150–51; *Necketopoulos v. Shalala,* 941 F.Supp. 1382, 1395 (S.D.N.Y.1996). The Secretary's application of that principle to the facts of this case, however, is greatly misplaced. Nowhere in plaintiffs' Amended Complaint do they either directly or indirectly seek a review of any benefit determinations. Plaintiffs do not seek an award of benefits, nor would resolution of

their claims entitle them to any benefits. Rather plaintiffs primarily attack the Secretary's procedures for notifying them of decisions on requests for an initial determinations and for reconsideration. As the Second Circuit explained in *New York v. Sullivan*, 906 F.2d at 918, exhaustion of such system-wide procedural claims through the administrative processes set up for individual benefits determinations would be "a pointless exercise." This is so because, "[a]lthough exhaustion may ... result[ ] in some individual members receiving benefits, the procedural right that the claimants [seek] to obtain ... [can] not [be] vindicated by individual eligibility decisions." *Id.; see also Skubel v. Fuoroli*, 113 F.3d 330 (2d Cir.1997) (exhaustion futile where agency position appears firm and no realistic possibility that the agency will change its position).

In *Jones v. Califano*, 576 F.2d 12, 18 (2d Cir.1978), the Second Circuit further noted that "Section 405(g) assumes as a condition for judicial review that the determination by the Secretary after a § 405(b) hearing will be adverse to the claimant of benefits. It makes no provision for judicial review of a determination favorable to the complainant." Thus, an individual plaintiff who may be fortunate enough to interpret an adverse notice of initial determination and have the HHA file a demand bill or claim, may ultimately receive a favorable benefit determination. The favorable determination would not, however, cure the procedural deficiencies experienced by the plaintiff, let alone effect system-wide change.

Even more problematic is the situation of those plaintiffs whose providers never file demand bills or claims. One of plaintiffs' chief complaints is that, where providers fail to file a claim, the beneficiary does not get any notice of initial determination. These plaintiffs necessarily will be unable to vindicate either their claim for benefits or their procedural claims. Accordingly, exhaustion would be futile. *See Schoolcraft v. Sullivan*, 971 F.2d 81, 87 (8th Cir.1992) ("[E]ven though exhaustion may often result in benefits being awarded it *never* removes or corrects the systemic errors at the initial and reconsideration stage[s] of the administrative process.") (emphasis in original; internal quotations omitted).

In short, because plaintiffs challenge the Secretary's procedures in handling their benefits determinations, their claims are collateral to their claims for benefits and, absent waiver, they will suffer irreparable harm due to the futility of seeking exhaustion of the available administrative procedures.[17] Accordingly, the court has jurisdiction over plaintiffs claims under Section 405(g) regardless of whether plaintiffs have exhausted the administrative procedures available to them.

### 3. Mandamus Jurisdiction Under Section 1361

■ There can be little doubt that plaintiffs seek "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to [them]." 28 U.S.C. § 1361. Specifically, the thrust of the Amended Complaint is an attempt to force the Secretary, through his agent, UGS, to comply with the alleged dictates of certain of the Medicare statute and regulations. Thus, on its face, the mandamus statute appears to confer jurisdiction over plaintiffs' claims. The Secretary, citing *Heckler v. Ringer*, 466 U.S. 602, 615, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984),

---

**17.** The court has considered but rejected plaintiffs' alternative argument in favor of waiver, that the Secretary waived his exhaustion argument by not raising it at the class certification stage. Specifically, the court finds the cases relied upon by plaintiffs easily distinguishable.

however, avers that "plaintiffs' failure to exhaust their administrative remedies precludes mandamus jurisdiction regarding those claims." (Def's Memo at 27 n. 11.) The Secretary's reliance on *Heckler* is misplaced.

As a preliminary matter, the Supreme Court, both in *Heckler* and in every other instance when it has been faced with this issue, has specifically declined to decide whether Section 405(h) bars mandamus jurisdiction to review claims arising under the Medicare Act. *Heckler*, 466 U.S. at 616–17, 104 S.Ct. 2013; *Your Home Visiting Nurse Services, Inc. v. Shalala*, 525 U.S. 449, 457 n. 3, 119 S.Ct. 930, 142 L.Ed.2d 919; *Bowen v. New York*, 476 U.S. 467, 478 n. 9, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986); *Norton v. Mathews*, 427 U.S. 524, 530, 96 S.Ct. 2771, 49 L.Ed.2d 672 (1976); *Mathews v. Eldridge*, 424 U.S. 319, 332 n. 12, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The Second Circuit has, however, tackled the issue and, noting the "impressive array of cases in this and other circuits," has held that Section 1361 jurisdiction does lie to review the procedures employed by the Secretary in deciding claims.[18] *Ellis v. Blum*, 643 F.2d 68 (2d Cir.1981); *see also Dietsch v. Schweiker*, 700 F.2d 865, 868 (2d Cir.1983).[19] Thus, mandamus jurisdiction is not precluded by operation of Section 405(h).

Furthermore, the Secretary's reliance on *Heckler* in support of his argument that mandamus jurisdiction is unavailable because plaintiffs have alternative means of relief available to them (i.e., the administrative procedures set forth in Section 405(g)), is misplaced. In *Heckler*, the Supreme Court explained that mandamus relief is available to a plaintiff "only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty." 466 U.S. at 616, 104 S.Ct. 2013. However, the Secretary improperly argues that plaintiffs' purported failure to exhaust all other avenues of relief would constitute a jurisdictional bar to plaintiffs' claims, as opposed to a challenge to the appropriateness of mandamus relief. In so arguing, the Secretary challenges the merits of plaintiffs' mandamus claim, not the availability of mandamus jurisdiction.

As the Second Circuit recently explained, "[w]hether a disputed matter concerns jurisdiction or the merits (or occasionally both) is sometimes a close question." *Da Silva v. Kinsho Intern. Corp.*, 229 F.3d 358, 361 (2d Cir.2000). Nonetheless, "[i]t is firmly established . . . that the absence of a valid (as opposed to arguable) cause of action does not implicate subject matter jurisdiction, *i.e.*, the courts' statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d

---

18. To the extent that *Ellis* can be read as holding that mandamus jurisdiction is available only for "procedural" claims, *see, e.g., Goulet v. Schweiker*, 557 F.Supp. 1250 (D.Vt. 1983), it is nonetheless applicable to the instant case. Plaintiffs' claims are purely procedural in that they do not seek benefits at all, but rather the Secretary's compliance with the procedures set forth in the regulations concerning notice of initial determinations and reconsideration decisions.

19. To the extent the language in *J.C. Penney Co. v. U.S. Treasury Dept.*, 439 F.2d 63, 68 (2d Cir.1971), that Section 1361 "may not . . . be construed to provide subject matter jurisdiction in the District Court," can be read as holding that Section 1361 is not an independent basis for subject matter jurisdiction, *J.C. Penney Co.* has been overturned, *sub silentio*, by *Ellis* and the Second Circuit precedent upon which *Ellis* relies. In any event, the better reading of *J.C. Penney Co.* is simply that the district court in that case did not have jurisdiction under Section 1361 because exclusive jurisdiction rested with the Customs Court (now the Court of International Trade) under 28 U.S.C. § 1582(a).

210 (1998) (emphasis in original). "Rather, the district court has jurisdiction if the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another, unless the claim clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Id.* (internal quotation and citation omitted). Although the courts have not explicitly held that the "exhaustion of all avenues" requirement for mandamus relief is non-jurisdictional, this holding is implicit in several key cases.

For example in *Anderson v. Bowen*, 881 F.2d 1 (2d Cir.1989), the Second Circuit "[a]ccept[ed] *arguendo* that mandamus jurisdiction theoretically can be invoked to permit judicial review of Part B determination despite the preclusive language of 42 U.S.C. § 405(h)," and then went on to "agree with the district court that *exercise of mandamus jurisdiction* would be inappropriate." *Id.* at 5 (emphasis added). Similarly, in *Heckler* the court first "[a]ssum[ed] without deciding that the third sentence of § 405(h) does not foreclose mandamus jurisdiction in all Social Security cases," and only then held that "the District Court did not err in dismissing respondents' complaint here because it is clear that no writ of mandamus could properly issue in this case." *Heckler*, 466 U.S. at 616, 104 S.Ct. 2013; *see also Abbey v. Sullivan*, 978 F.2d at 47 ("[O]ne of the requisites for obtaining a writ of mandamus is that the plaintiff have exhausted all other adequate remedies."). Accordingly, the court declines the Secretary's invitation to engage in a "drive-by jurisdictional ruling[ ]," *Steel Co. v. Citizens for a Better Environment*, 523 U.S. at 91, 118 S.Ct. 1003.

In any event, as discussed above, although plaintiffs have not exhausted the Medicare Act's internal administrative appeals procedure, sufficient grounds exist to waive such exhaustion. *See Mercer v. Birchman*, 700 F.2d 828 (2d Cir.1983) (applying same waiver of exhaustion analysis as that applied in determining waiver of 405(g)); *Ellis v. Blum*, 643 F.2d 68 (2d Cir.1981) (same); *Ciccone v. Apfel*, 38 F.Supp.2d 224 (E.D.N.Y.1999) (assuming sub silentio that because Second Circuit has held that section 405(h) does not preclude mandamus, no need to exhaust). Accordingly, this court has subject matter jurisdiction to hear plaintiffs' claim that they are entitled to mandamus relief because the Secretary has violated a clear non-discretionary regulatory mandate.

## C. *STANDARD OF REVIEW*

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.), *cert. denied*, 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). "This is true even [where] the court [is] presented with cross-motions for summary judgment; each movant has the burden of presenting evidence to support its motion that would allow the district court, if appropriate, to direct a verdict in its favor." *Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d Cir.1988). Thus, "[w]hen faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other. Rather, the court must evaluate each party's motion on its

own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993) (internal quotation and citation omitted).

## D. *DO UGS's PRACTICES VIOLATE THE MEDICARE REGULATIONS?*

Plaintiffs argue that UGS's handling of their requests for initial determinations and decisions on requests for reconsideration violate the Medicare regulations in several ways. Specifically, plaintiffs argue that, whenever a provider fails to file a claim, they receive no notice of initial determination from UGS. Plaintiffs further argue that the explanation for a decision on a request for initial determination contained in the MSN form, which UGS issues as a notice of initial determination, is not "state[d] in detail" as required by 42 C.F.R. § 405.702. Plaintiffs also challenge UGS's practice of not sending a copy of the MSN to a beneficiary's representative. Finally, plaintiffs assert that the Secretary has failed to ensure that UGS issues timely and accurate decisions on requests for initial determinations and for reconsideration.

Plaintiffs' claims thus focus on whether the Secretary, through UGS, has failed to follow the Medicare regulations. The court must, therefore, determine whether the Secretary's challenged actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), *incorporated by* 42 U.S.C. § 1395oo(f)(1), *as noted in Thomas Jefferson University v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). In so doing, the court must, of course, "give substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson University,* 512 U.S. at 512, 114 S.Ct. 2381; *see also Barn-*

*hart,* 122 S.Ct. at 1269. The court's "task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation. In other words [the court] must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulations's promulgation." *Thomas Jefferson University,* 512 U.S. at 512, 114 S.Ct. 2381 (internal quotations omitted). An agency's interpretation of its own regulations that conflicts with a prior interpretation is, however, " 'entitled to considerably less deference' than a consistently held agency view." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (*quoting Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981)).

### 1. *UGS improperly fails to issue a notice of initial determination on a beneficiary's request for determination when no claim has been filed by the HHA.*

■ Plaintiffs argue that, in certain circumstances, a beneficiary never receives a notice of initial determination from UGS as required by the Medicare regulations. Specifically, plaintiffs assert that, if the beneficiary files a request for a determination with UGS, but the HHA fails to submit a claim for coverage, UGS does not issue a notice of initial determination. Similarly, if the beneficiary submits a request for an initial determination, but the HHA submits a late, incomplete, or otherwise improper claim, UGS simply rejects the HHA's claim, deletes it from the system, and does not issue a notice of initial determination to the beneficiary.[20] As a

---

**20.** The plaintiffs argue that the problem is

exacerbated because UGS handles many pro-

result of UGS procedures, plaintiffs assert, the beneficiary is left in a procedural no-man's land because he or she has no notice of initial determination from which to seek further review of the claim for coverage. The beneficiary is also left without documentation with which to insist that the HHA reimburse the beneficiary for the cost of the home health care services because the HHA has violated its statutory duty to submit the requested claims information.[21]

At oral argument, counsel for the Secretary confirmed in response to a direct question from the court, that "if a claim is not made by a provider, [then] there is nothing that shows up on the MSN ... there is no notice given to an individual or to a representative or to anyone ... that they need to try to do anything to challenge" the determination. (Trans. Oral Arg. at 67.) The Secretary further admits that UGS does not accept reconsideration determinations when a claim is deemed rejected by UGS at the initial determination stage. Appendix to Def Opp, Tab 1, ¶ 9. Thus, it is undisputed that UGS does not issue a notice of initial determination when the provider fails to submit a claim, or submits an inaccurate, untimely or otherwise improper claim, and that the lack of notice effectively precludes further administrative review of the beneficiary's request.

There can be no serious dispute that the Medicare regulations contemplate that the Secretary will provide a notice of initial determination not only in response to proper claims filed by providers, but also in response to requests for initial determi-nations filed by beneficiaries. Specifically, 42 C.F.R. § 405.702 provides, in pertinent part, that "[a]fter a request for payment ... is filed with the intermediary *by or on behalf of the individual who received ...* home health services, and the intermediary has ascertained whether the items and services furnished are covered ... and where appropriate, ascertained and made payment of amounts due or has ascertained that no payments were due, *the individual* will be notified in writing of the initial determination in *his* case." (emphasis added). That section further provides that "[t]hese notices shall be mailed *to the individual* and the provider of services at their last known addresses and shall state in detail the basis for the determination. Such written notices shall also *inform the individual* and the provider of services of their right to reconsideration of the determination if they are dissatisfied with the determination." *Id.* (emphasis added). The regulations nowhere contemplate, as a prerequisite to issuance of a notice, the timely submission of a proper, complete claim. Indeed, the regulations' very definition of what constitutes an "initial determination" includes a response to a request for an initial determination from a beneficiary, not solely a response to a claim filed by a HHA. 42 C.F.R. § 405.704(b) ("An initial determination with respect to an individual includes any determination made on the basis of a request for payment by or on behalf of the individual under part A of Medicare, including a determination with respect to: ... [a]ny ... issues having a present or potential effect on the amount of benefits to be paid under

---

vider claims in batches. Thus, while determinations are made for some claims, coverage for other services often remains unresolved.

21. In contracting with HCFA and the RHHIs, HHAs agree not to charge beneficiaries for "[s]ervices for which the beneficiary would be entitled to have payment made if the provider ... [h]ad furnished the information required by the intermediary in order to determine the amount due the provider on behalf of the individual for the period with respect to which payment is to be made or any prior period." 42 C.F.R. § 489.21(b).

part A of Medicare ....”); *see also* 42 C.F.R. § 424.32(b) (including in the “prescribed forms for claims” “CMS–1490S—Request for Medicare payment. (For use by a patient to request payment for medical expenses.)”). In short, the plain language of the regulations requires a notice of initial determination be sent in response to a beneficiary’s request for determination, irrespective of whether a timely and complete claim has been filed by the provider.

The Secretary correctly notes that, if no claim is filed by the HHA, UGS may be unable to make a determination whether the home health care services are covered. *See, e.g.,* 42 C.F.R. § 424.5(5) (“Claim for payment. The provider, supplier, or beneficiary, as appropriate, must file a claim that includes or makes reference to a request for payment, in accordance with Subpart C of this part.”); 42 C.F.R. § 424.30 (“Claims must be filed in all cases except when services are furnished on a prepaid capitation basis by a health maintenance organization (HMO), a competitive medical plan (CMP), or a health care prepayment plan (HCPP).”). There can be little doubt that, absent information from the HHA concerning the services provided, a substantive determination of whether benefits under the Medicare Act and regulations are appropriate cannot be made. *See* 42 C.F.R. § 424.5(6) (“The provider, supplier, or beneficiary, as appropriate, must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment.”). Indeed, as the Secretary recently acknowledge to a court in this District, “[t]he only way that a Medicare home health beneficiary can obtain an official Medicare determination with respect to [an] HHA’s decision of non-coverage is through the submission of a demand bill.” *Healey v. Shalala,* No. 3:98CV418 (DJS), 2000 WL 303439, 68 Soc. Sec. Rep. Ser. 212 (D.Conn., Feb. 11, 2000). A “demand bill is [thus] the key to the administrative process and thence, if necessary, to judicial review under 42 U.S.C. § 405(g).” *Id.*

It simply does not follow, however, that if UGS can not make a substantive benefits determination for lack of sufficient claim information from the HHA, that UGS therefore can not and/or need not send the beneficiary a notice of initial determination. As discussed above, the regulations make no such distinction. Rather, a beneficiary is quite plain and simply entitled to a notice of initial determination. Moreover, the lack of a determination going to the merits of a request does not mean that the notice of initial determination would be a dead letter. To the contrary, a notice of initial determination is essential to a beneficiary even when a request is rejected for incomplete or late-filed claims information. Absent a notice of initial determination, a beneficiary is left without any right to appeal the determination. As the Secretary has acknowledged, an initial determination “must be made before any appeals rights on that claim can be afforded.” *HCFA Program Safeguard Statement of Contractor Work* § 7F “Appeals Process for Claim Determinations” at www.hcfa.gov. Indeed, the notice of initial determination is the vehicle by which beneficiaries are “inform[ed] ... of their right to reconsideration of the determination if they are dissatisfied with the determination.” 42 C.F.R. § 405.702. Furthermore, the initial determination serves as documentation with which the beneficiary can seek reimbursement from a provider that has failed in its statutory obligation to provide prompt proper claims information to the RHHI in support of a demand bill. This is evidenced by the fact that other RHHIs, including AHS, the RHHI for the region encompassing Connecticut, include statements of liability in initial determinations when providers commit errors in submitting the claim.

Thus, the fact that a substantive determination on the merits of a beneficiary's request has not been rendered does mean there would be nothing for the beneficiary to appeal. For example, if UGS informed the beneficiary, in a notice of initial determination, that the beneficiary's request was denied because either no claim information or incomplete or late claim information was filed by the HHA, the beneficiary could seek reconsideration (and, if necessary, further administrative and judicial review) arguing that the claim information was in fact timely provided. Absent a notice of initial determination a beneficiary would have no administrative remedy to correct the improper rejection of a request due to claimed late or incomplete claims information. Similarly, the beneficiary can use the notice of initial determination to demand reimbursement from the HHA because it failed to file a timely and proper claim.[22]

In short, plaintiffs correctly aver that UGS's current procedure for handling requests for determinations where the HHA has either failed to file a claim, or has filed an incomplete or late claim, violates the clear language of the Medicare regulations. Although the court would ordinarily defer to the Secretary's imposition of the additional requirement that a timely and complete claim be filed before issuance of a notice of initial determination, such deference "is unnecessary and inappropriate" because the Secretary's "interpretation is not only inconsistent with the language of the [Medicare] statute and its purpose, but also in defiance of common sense." *New York State Dept. of Social Services v. Bowen*, 846 F.2d 129, 134 (2d Cir.1988) (internal citation omitted). Accordingly, plaintiffs are entitled to summary judgment on their claim that the Secretary's failure to issue a notice of initial determination violates the Medicare regulations.

### 2. The explanation for the initial determination contained in the MSN is not "state[d] in detail" as required by 42 C.F.R. § 405.702 [23]

■ Plaintiffs next contend that the

**22.** At oral argument, the Secretary averred that the State of Connecticut, as subrogee to the beneficiary, could and should simply acquire mass information from both beneficiaries and providers and then determine, on the basis of that information, if the providers properly submitted claims on demand bills. (Trans. Oral Arg at 67.) If the providers had not done so, the State could then require the provider to pay for the service or file a claim. As a preliminary matter, the Secretary has failed to provide any legal support for the assertion that the State could accomplish this goal, let alone that it must do so.

More importantly, the Secretary's argument misses the point. Even assuming the State could determine, en masse, which providers had failed to file claims on demand bills and then seek reimbursement, and assuming further that the Secretary does not have the duty to engage in en masse canvassing of claims, the Secretary remains obligated under the Medicare regulations to issue an initial determination to individual beneficiaries. Although as a practical matter, under Connecticut's TPL system, the State of Connecticut is the "man behind the curtain," the Secretary has failed to demonstrate any legal significance to the fact that the individual beneficiaries have subrogated their rights to the state. Similarly, although the Secretary may be correct in asserting that UGS has no duty respond *en masse* to a request from CMA as to whether and which providers have failed to file claims, this in no way diminishes the Secretary's regulatory duty to provide individual determinations on demand bills.

**23.** The Secretary initially took the position that the electronic data it sent CMA on a monthly basis was the notice of initial determination. *See, e.g.,* Def's Answer at ¶ 58 of ("CMA and dually eligible beneficiaries receive notice of initial determinations in electronic form, but otherwise denies the allegations in this paragraph."). The Secretary's current position is that the MSN, not the electronic submission, constitutes the initial determination.

form of notice of initial determination that UGS sends to beneficiaries, the MSN, does not comport with the regulations' requirement that notices of initial determination "state in detail the basis for the determination." 42 C.F.R. § 405.702. Although the regulations do not elaborate on the requirement that the notice "state in detail the basis for the determination," a common sense reading of the relevant statutes and regulations indicates that the notice must, at a minimum, contain sufficient information for the beneficiary to file a proper request for reconsideration.[24] Specifically, the very next sentence of the regulation requires that the "notices . . . inform the individual and the provider of services of their right to reconsideration of the determination if they are dissatisfied with the determination." *Id.* Furthermore, 42 U.S.C. § 1395h(j) mandates that provider agreements "require that, with respect to a claim for home health services . . . that is denied," the HHA will "furnish the provider and the individual with respect to whom the claim is made *with a written explanation of the denial and of the statutory or regulatory basis for the denial* . . . ." Finally, the Secretary requires that a request for reconsideration specifically refer to an initial determination. In HCFA transmittal AB–00–122 (Dec. 7, 2000), the Secretary stated the following:

> For Part A appeals, the Medicare regulation at 42 C.F.R. 405.710 states that a party that is dissatisfied with the initial determination may request a reconsideration of such determination. It is clear that the request for reconsideration must be tied to a specific, identifiable initial determination. However, it is not sufficient to simply identify a beneficiary, or a certain time period, for example. The appeal must not only identify the

initial determination with which the party is dissatisfied, but must also meet the requirements for the contents of an appeal request below.

\* \* \* \* \* \*

> Medicaid State agencies or the party authorized to act on behalf of the Medicaid State agency are responsible for submitting documentation, if any, that supports the contention that the initial determination was incorrect under Medicare coverage and payment policies.

(Pl's App. to Rule 9(c)2 Stmt., Attachment 3 at p. 3.)

It is undisputed that the MSN is part of the provider claims processing system, and therefore is designed to furnish information summarizing all the claims processed by the intermediary during the prior month, both inpatient and outpatient, and a record of services received and the status of any deductibles. Although there is no theoretical problem with the Secretary using the MSN as both a summary of processed claims and a notice of initial determination, in its current form the MSN falls short of providing sufficient information to constitute a proper notice of initial determination.

First and foremost, it is undisputed that the MSN does not provide any information concerning a request for determination when the provider has failed to file a timely or complete claim. As discussed in the immediately preceding section of this ruling, however, the Medicare regulations require that a notice of initial determination be sent not only in response to timely and complete claims filed by a provider, but rather also in response to a beneficiary's request for initial determination. The

---

**24.** By statute, the Secretary is required to "take such actions as are necessary to ensure that any notice to one or more individuals issued pursuant to this title by the [Secretary] or by a State agency . . . is written in simple and clear language . . . ." 42 U.S.C. § 405(s).

MSN is plainly insufficient in this regard because a beneficiary will have no notice of initial determination from which it may seek further review.

In addition, the explanation for a benefit denial contained in the MSN does not refer to the regulatory section that served as the basis for the denial. The statutes, however, clearly contemplate such a reference. *See* 42 U.S.C. § 1395h(j). Moreover, UGS provided reference to the regulations relied upon in reaching a denial determination in the form notice it utilized prior to the MSN. Without the required notice of the regulatory section upon which UGS relied in denying a claim, a beneficiary cannot formulate a meaningful argument in response.

Not all of plaintiffs' challenges to the MSN, however, are well founded. Specifically, plaintiffs incorrectly argue that the MSN is deficient because it refers to a range of dates rather than the specific date on which a particular service was performed. Plaintiffs rely on eleven cases in which ALJs have determined that UGS, by issuing a decision that fails to disclose a basis for denial, has failed to issue a valid initial determination that could be reconsidered or appealed to an ALJ. It is apparent, however, that in those eleven cases CMA relied upon the electronic data previously provided CMA by UGS, rather than the MSN, as the notice of initial determination. Both the former notice and the MSN contain ranges of dates of services. Under the plain language of the MSN, a beneficiary need only fill out the "appeals"

portion of the form and circle the specific items with which he or she disagrees. Thus although the MSN does not list specific dates of services, the services are sufficiently identifiable to permit the beneficiary to seek review.

Finally, plaintiffs complain that the MSN does not contain explicit notice that a claim is not covered. Rather, an inference must be drawn from the fact that an amount appears in the "non-covered charges" column of the form. It would certainly be easier for a beneficiary to determine which services are covered, and which are not, if explicit notice of non-coverage were given. That is not, however, the issue. The pertinent question is whether the MSN states in detail the basis for adverse determinations, as required by the regulations. The MSN clearly accomplishes this by referencing the reader to the "notes" section, in which a narrative description of the denial appears.[25] The fact that the beneficiary must take an inferential step to assess the scope of coverage afforded, although not ideal, does not render the MSN deficient.

The MSN fails in some very important ways to "state in detail the basis of the determination" as required by the Medicare regulations. Thus, to the extent plaintiffs' motion for summary judgment attacks the MSN as failing to comply with the regulatory requirement to "state in detail the basis of the determination," the motion is granted.

**25.** The Secretary's institution of the Claim Expansion Line Item Processing ("CELIP") program does not impact the court's analysis. Specifically, the only apparent change to the MSN brought about by the CELIP program is that claims are submitted, and determinations are made, on a line-by-line, service-by-service basis. Similarly, the Secretary's recent decision to provide DSS with a "cross-over file" is of no moment. Specifically, the cross-over file simply details UGS's treatment of processed claims. It does not reflect the treatment of requests for determination where no claim is filed by the HHA. In addition, the beneficiary still gets an MSN. Thus, at most, the cross-over file appears to be a supplement to, or substitute for, the electronic data previously provided to CMA and not a revised method of providing a notice of initial determination in compliance with the regulations.

### 3. UGS does not, as required by the regulations, send a copy of the notice of initial determination to the beneficiary's representative.

■ Plaintiffs also argue that UGS violates the Medicare regulations by failing to send a copy of the MSN to the beneficiary's representative, in most cases CMA. Instead UGS sends CMA various electronic data and spread sheets. The Secretary denies that the regulations require it to provide a copy of the MSN to a beneficiary's representative and argues that it would be a practical impossibility to do so. The court concludes that, although the regulations are less than clear on the issue, the better reading is that they require a notice of initial determination be sent to a beneficiary's representative.

■ Ordinarily, of course, the court would "give substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson University,* 512 U.S. at 512, 114 S.Ct. 2381. The Secretary's interpretation of the regulations concerning whether a copy of the notice of initial determination must be sent to a beneficiary's representative is not, however, entitled to this high level of deference. Specifically, it is well settled that an agency's interpretation of its own regulations that conflicts with a prior interpretation is " 'entitled to considerably less deference' than a consistently held agency view." *INS v. Cardoza–Fonseca,* 480 U.S. at 446 n. 30, 107 S.Ct. 1207 (*quoting Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981)). Moreover, deference is not accorded "to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative

practice, because [t]he deliberateness of such positions, if not indeed their authoritativeness, is suspect." *Smiley v. Citibank (South Dakota), N.A.,* 517 U.S. 735, 741, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996) (quotation and citation omitted).

Here, the Secretary's position concerning whether notice of an initial determination must be sent to a representative is not only a current litigation position unsupported by more formal agency pronouncement, but is an inconsistent litigation position as well. Specifically, in its Answer to Paragraph 27 of Amended Complaint, the Secretary admitted that "written notice of the individual determination must also be sent to an individual's representative. 42 C.F.R. § 405.701(c) and 20 C.F.R. § 404.1715(a)." At no time has the Secretary moved to amend his Answer.[26] Furthermore, despite being pressed at oral argument, counsel for the Secretary was unable to point to any agency rule, regulation or practice indicating that the Secretary's official position, outside the current litigation, is that representatives are not entitled to a copy of the notice of initial determination.

In fact, the only agency policy brought to the court's attention reflects just the opposite. In a February 1994 HCFA Program memorandum, No. AB–94–1, the Secretary took the position that "Section 404.1715 of Title 20 of the Code of Federal Regulations (CFR), applied to Part A claims pursuant to 42 CFR 405.701(c), and 405.872 of title 42 of the CFR state that representatives are entitled to copies of all notices on actions for which they are a representative. The appointed representative, in addition to the beneficiary, is entitled to a copy of the EOMB,[27] Medi-

---

**26.** The court will not, as plaintiffs request, treat the Secretary's statement of its prior interpretation in its Answer to the Amended Complaint as a judicial admission. *See generally Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,* 757 F.2d 523, 528 (2d Cir.1985) ("A party's

*assertion of fact* in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding.") (emphasis added).

**27.** EOMBs were the precursors to MSNs.

care Part B Notice and NOU." *Medicare/Medicaid Guide* (CCH) ¶ 42,087 (1994). Accordingly, the court will afford no deference to the Secretary's inconsistent litigation position that the regulations do not require notice of an initial determination to be sent to a beneficiary's representative.[28]

Plaintiffs assert that 20 C.F.R. § 404.1715(a), which states that the Secretary "shall send your representative—(1) Notice and a copy of any administrative action, determination, or decision; and (2) Requests for information or evidence," is incorporated into Subpart G of the Medicare Act (concerning appeals of part A determinations) by operation of 42 C.F.R. § Section 405.701(c). Section 405.701(c) provides, in pertinent part, that "[s]ubparts J and R of 20 CFR part 404 (dealing with determinations, the administrative review process and representation of parties) are also applicable to matters arising under paragraph (a) of this section, except to the extent that specific provisions are contained in this subpart." Section 404.1715(a) is contained in Subpart R. Thus, the salient issue is whether "specific provisions are contained in" Subpart G of the Medicare Act, thereby precluding incorporation of Section 404.1715(a) into Subpart G.

Plaintiffs argue that Subpart G does not contain "specific provisions" concerning whether a beneficiary's representative is entitled to receipt of a notice of initial determination. Because the statute is silent on this issue, they argue, Subpart G does not contain "specific provisions" and Section 405.1715(a) fills the void. The Secretary interprets the regulations' silence

on the issue in exactly the opposite manner. Specifically, the Secretary argues that Section 405 does contain "specific provisions" because it provides that a notice of initial determination must be sent to the beneficiary (and sometimes the provider). In addition, 42 C.F.R. § 405.716, concerning notice of reconsideration decisions, explicitly requires that both a beneficiary and the beneficiary's representative receive notice of the decision. Thus, the Secretary concludes, where the regulations see fit to require notice to the representative, they specifically require it.

Both competing interpretations urged by the parties are too narrow. Subsection R of the Federal Old-age, Survivors and Disability Insurance concerns, inter alia, the qualifications, availability, fees, and rules of conduct for representatives. Section 404.1715 of that subpart, titled "Notice or request to a representative," provides that the Secretary "shall send [a beneficiary's] representative—(1) Notice and a copy of *any administrative action, determination, or decision;* and (2) Requests for information or evidence." (emphasis added). It also provides that "[a] notice or request sent to your representative, will have the same force and effect as if it had been sent to you." Thus, both the plain language and context of Section 404.1715 indicate that it states a general rule concerning communication of notice of agency actions to represented individual, not a rule concerning whether and to whom notice is due for any specific agency determination.

Subpart G does not contain any "specific provisions" establishing a different rule concerning communications of agency ac-

---

**28.** The Secretary argues that its current position is reflected in the fact that all intermediaries will be switching to the MSN. Because the MSN can not be sent unredacted to a beneficiary's representative, the Secretary argues that the agency's implicit policy is that a

notice of initial determination need not be sent to a beneficiary's representative. Even assuming an agency practice can be divined from these actions, this is not the type of deliberate or authoritative administrative action warranting deference.

tions to represented individuals. Rather, the sections of Subpart G cited by the Secretary as "specific provisions" (i.e., Sections 405.702 and 405.716) relate narrowly to notices of initial determinations and reconsideration. Specifically, section 405.702 requires only that the Secretary "shall also inform the individual and the provider of services of their right to reconsideration of the determination if they are dissatisfied with the determination." Section 405.716 provides that "[w]ritten notice of the reconsidered determination shall be mailed ... to the parties and their representatives ...." Both sections are silent concerning the impact of beneficiary representation on the administrative proceedings, including the impact of representation on the required recipients of notice of agency action. Accordingly, Section 404.1715 is incorporated into Subpart G and, by operation of that section, notice of an initial determination must be sent to a beneficiary's representative.

This reading is consistent with the language of Subpart H, concerning part B benefits. Specifically, Subpart H contains a specific subsection titled "Authority of representatives." 42 C.F.R. § 405.872. It sets forth the powers of a representative: to "make or give, on behalf of the party he represents, any request or notice relative to any proceeding before the carrier in-

cluding review and hearing," and "to present evidence and allegations as to facts and law in any proceeding affecting the party he represents and to obtain information with respect to the claim of such party to the same extent as such party." *Id.* Consistent with this recognition of the authority of a beneficiary's representative, Section 405.872 goes on to require that "[n]otice to any party [of] any action, determination, or decision, or request to any party for the production of evidence, shall be sent to the representative of such party." [29] *Id.* Absent the incorporation of Section 405.1715, Subpart G would not contain analogous language concerning the impact of beneficiary representation.[30]

In addition, the court's reading of the regulations is less strained than that proposed by the parties and comports with common sense. *Cf. Bersani v. Robichaud, E.P.A.,* 850 F.2d 36 (2d Cir.1988) ("While this argument has a certain surface appeal, we are persuaded that it is contrary to a common sense reading of the regulations; that it entails an overly literal and narrow interpretation of the language ...."). Specifically, it would make little sense in cases where the Secretary knows that the beneficiary is represented to instead require that notice go directly to the beneficiary. Rather, if the Secretary is aware

---

**29.** It is worth noting that the court's reading, although in substantial agreement with plaintiffs' proposed reading, differs in one important respect. Plaintiffs implicitly argue that, as incorporated, Section 404.1715, in tandem with section 404.702, requires that a Notice of Initial Determination be sent both to an individual and to his or her representative. The court reads the plain language of Section 404.1715 as requiring that, where represented, an individual will not receive direct notice of agency determinations, but rather notice will be provided to the representative and will be binding upon the individual. Thus, plaintiffs' complaint that the MSN is not sent to the beneficiary if the beneficiary is DSS, exercising its subrogation rights, is misplaced.

The Secretary is not required to send the notice of initial determination to DSS if, as appears to be the case in all instances, DSS is represented by CMA. Of course, with respect to reconsideration decisions, Section 405.716 specifically requires notice to both the individual and to the representative. DSS should therefore receive reconsideration decisions.

**30.** Similarly, the Secretary has offered no principled reason why the regulations would require all part B initial determinations and reconsideration decisions, and part A reconsideration decisions, to be sent to a beneficiary's representative, but would not require that representatives receive notice of a Part A initial determinations.

that a beneficiary is represented, there is no compelling reason why notice should not go to the representative, yet be binding on the beneficiary. It is especially appropriate that a beneficiary's representative receive notice of the initial determination because the initial determination is binding unless a timely request for reconsideration is filed. 42 C.F.R. § 405.708.

To be sure, there is no perfect reading of these regulations, not even the one adopted here. Specifically, with respect to decisions on requests for reconsideration, Section 405.716 explicitly requires notice be sent both to the beneficiary and his or her representative. Section 404.1715 would then doubly require notice to a beneficiary's representative. It would also, however, require notice to a represented beneficiary, unlike Section 405.702, which requires notice only to the representative. In any event, because the language is at most redundant, the overlap does not, standing alone, compel an alternate reading. *Cf. Callaway v. C.I.R.*, 231 F.3d 106, 131 (2d Cir.2000) ("[I]n a statutory scheme as complex as the Internal Revenue Code and its implementing Treasury Regulations, we should not be surprised to find repetitive 'surplusage.' ").

Finally, the Secretary's argument that it would be impossible for UGS to send an MSN to a beneficiary's representatives is unavailing. The Secretary asserts that he can not simply send CMA a beneficiary's MSN because CMA is only authorized to represent beneficiaries with respect to home health care claims. The MSNs, however, sometimes contain information concerning additional medical services provided to a beneficiary for which CMA is not the beneficiary's authorized representative. Thus, the Secretary concludes, he is prohibited from disclosing this other information to CMA due to the beneficiary's privacy rights. In addition, the Secretary notes that the computer system currently used by UGS to process claims and to generate the MSN is not capable of generating an additional redacted copy to be separately sent to CMA.

The Secretary's practical concerns about the present form in which it provides notices of initial determinations (i.e., the MSN) are, of course, of no moment in determining whether, as a matter of law, the regulations require notice be sent to a beneficiary's representative. In any event, the Secretary's argument proves too much. There is no dispute that UGS used to send notices of initial determinations to a beneficiary's representative, and that another intermediary, AHS, still does send notices of initial determinations to a beneficiary's representative. The problem is not that the Secretary can not provide notice of an initial determination to a beneficiary's representative, but rather that it can not do so using the form of notice that UGS currently provides. In other words, the plaintiffs do not complain that a MSN is not sent to a beneficiary's representative, but that a notice of initial determination is not sent.

In short, the court reads Subpart G as containing "specific provisions" concerning the required recipients of initial determinations and reconsideration decisions, namely Sections 405.702 and 405.716. Subpart G does not, however, contain "specific provisions" concerning communication of agency actions in Subpart G proceedings to representatives of beneficiaries. Thus, Section 404.1715, which concerns the impact of beneficiary representation is incorporated by Section 405.701(a). Plaintiffs are therefore entitled to summary judgment on their claim that UGS violates the Medicare regulations when it does not send a copy of the notice of initial determination to a beneficiary's known representative.

### 4. The Secretary has not failed to ensure that UGS's decisions are sufficiently accurate and timely.

■■■ Plaintiffs, relying primarily on statistical data concerning the rates at which UGS's initial determinations and reconsideration decision are reversed, assert that UGS denies coverage at an unacceptably high rate. Plaintiffs also assert that UGS's decisions are untimely because they often sit for long periods of time unresolved. Importantly, unlike the balance of plaintiffs' claims, plaintiffs do not attack the Secretary's handling of their requests, through UGS as his agent. Rather, plaintiffs aver that the Secretary has failed properly to monitor UGS's performance and require it to render acceptably accurate and timely decisions.[31] Specifically, plaintiffs request that the court enjoin the Secretary from "failing to monitor [UGS] on a regular basis to ensure that its initial determinations [and decisions on requests for reconsideration] reflect a consistently accurate interpretation and application of the Medicare statute, regulations and guidelines." Amended Compl., Prayer for Relief, ¶¶ 5A. iii & 5 B. iii. They also seek to enjoin the Secretary from "failing to

evaluate and assess the performance of [UGS] on a regular basis, using criteria set forth in the Code of Federal Regulations to ensure that it is fully complying with the requirements regarding initial determinations [and reconsiderations], with consideration given to reassigning the providers now assigned to [UGS] to the regional intermediary." Id. ¶¶ 5 A. iv. & 5 B iv.

There can be little doubt that, if plaintiffs' statistical evidence paints an accurate picture of UGS's handling of plaintiffs' claims, its performance has been far from admirable. Even assuming plaintiffs' depiction is true, however, plaintiffs are not entitled to summary judgment. Specifically, the court cannot view the data concerning UGS's performance in a vacuum. Rather, the data must be viewed in the context of the procedures and standards by which the Secretary monitors UGS's performance and takes action on the basis of results obtained through this oversight.

The Secretary correctly points to the relevant statutory and regulatory context in which his supervision of UGS must be measured. Specifically, the Secretary is required to "develop standards, criteria, and procedures to evaluate [an] agency's

---

31. In contrast, plaintiffs' other claims directly attack the Secretary's handling of their requests for determination through UGS, his designated agent. To the extent the Secretary's opposition can be read as arguing that all of plaintiffs' claims are barred because he has properly monitored UGS, it is mistaken. UGS is the agent of the Secretary and therefore the Secretary is ultimately directly responsible for the actions of UGS, notwithstanding that HHS has delegated its power to UGS. 42 C.F.R. § 421.5(b) ("HCFA is the real party of interest in any litigation involving the administration of the [Medicare] program."); see also Pavano v. Shalala, 95 F.3d 147, 148 n. 1 (2d Cir.1996) ("Because the carriers are authorized agents of the HCFA and, more broadly, the Department of Health and Human Services, see 42 U.S.C. § 1395u(a), the Secretary is the real party in interest here, see 42 C.F.R. § 421.5(b)."); Pani v. Empire Blue

Cross Blue Shield, 152 F.3d 67, 71–72 (2d Cir.1998) (noting that several jurisdictions have found that fiscal intermediaries are immune from suit for processing Part B claims because "the suit at issue is really one against the United States because the fiscal intermediary or carrier is a government agent that 'act[s] on behalf of the [Medicare] Administrator in carrying out certain administrative responsibilities that the law imposes' and is entitled to indemnification from the United States, which, therefore, is 'the real party of interest.' "); Bartlett Memorial Medical Center Inc. v. Thompson, 171 F.Supp.2d 1215, 1224 (W.D.Okla.2001) (Under the Medicare scheme, "[t]he intermediaries are agents of the Secretary charged with the relevant duties under the Medicare Act and its regulations and, as such, they may properly be bound by a writ of mandamus against the Secretary.") (quotation and citation omitted).

or organization's (A) overall performance of claims processing . . . and other related functions required to be performed by such an agency or organization under an agreement entered into under this section, and (B) performance of such functions with respect to specific providers of services, and the Secretary shall establish standards and criteria with respect to the efficient and effective administration of this part." 42 U.S.C. § 1395h(f). The Secretary is further charged with using the standards "to determine whether [he] should enter into, renew, or terminate an agreement under this section with an agency or organization, whether the Secretary should assign or reassign a provider of services to an agency or organization, and whether the Secretary should designate an agency or organization to perform services with respect to a class of providers of services . . . ." *Id.*

In accordance with this statutory mandate, the Secretary has developed the required criteria and a concomitant system for monitoring and enforcing intermediary performance. *See* 66 FR 67257–01, 2001 WL 1657091 (fiscal year 2002); 65 FR 64968–01, 2000 WL 1614200 (fiscal year 2001); 64 FR 67920–01, 1999 WL 1082412 (fiscal year 2000); 59 FR 46258–01, 1994 WL 479444 (fiscal year 1995); 58 FR 51085–01, 1993 WL 383169 (fiscal year 1994); 57 FR 43230–03, 1992 WL 227677 (fiscal year 1993); 56 FR 47758–01, 1991 WL 184375 (fiscal year 1992). Plaintiffs do not challenge the appropriateness of the Secretary's criteria and monitoring procedures; rather, plaintiffs challenge the Secretary's application of these established standards to UGS.

Plaintiffs' argument fails in the face of the comprehensive intermediary monitoring system established in the regulations. Specifically, the reversal rate and timeframes for processing of claims are only a few of the criteria by which the Secretary examines intermediary claims handling, and an intermediary's claims handling is only one of several criteria by which the Secretary evaluates an intermediary's overall performance. Moreover, an intermediary's failure to meet a particular criterion means only that a series of additional steps are triggered, including the submission of a performance improvement plan outlining how the intermediary will improve its performance. The Secretary then has discretion to take one of a spectrum of possible steps to oversee the intermediary's progress in meeting its goals and, if necessary, take further action (e.g., amendment of the intermediary agreement imposing special conditions, removal of automatic renewal clauses and imposition of cost limitations, reassignment of providers to another intermediary, entry into a short-term contract, and/or termination or non-renewal of the intermediary's contract).

In other words, the Secretary has averred that UGS has met or exceeded overall expectations within this framework. In contrast, plaintiffs assert only that UGS has failed to comply with specific criteria within this framework. Thus, even assuming plaintiffs' statistical proof demonstrates that UGS has provided tardy and inaccurate initial determinations and decisions on requests for reconsideration, plaintiffs have simply failed to demonstrate how the Secretary has abused his discretion in failing to enforce non-compliance with the violated standards. Accordingly, the Secretary is entitled to summary judgment on plaintiffs' claims that he has failed properly to monitor UGS's performance and that seek him to compel compliance with his own standards of performance. *Cf. New Jersey Speech–Language–Hearing Ass'n v. Prudential Ins. Co. of America,* 551 F.Supp. 1024 (D.N.J. 1982) (mandamus relief would be inappropriate where, inter alia, the Secretary

could not be plainly violating a clear legal obligation owed to plaintiffs).[32]

## E. *ARE UGS's PROCEDURAL SHORTCOMINGS A VIOLATION OF THE PLAINTIFFS' PROCEDURAL DUE PROCESS RIGHTS?*

■ The parties concur that the seminal case of *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), provides the framework within which this court must review plaintiffs' procedural due process claims. Specifically, " '[d]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Id.* at 334, 96 S.Ct. 893 (internal citation omitted), *quoting Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Rather, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.* (internal quotation omitted), *quoting Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Thus, to determine whether the administrative procedures provided by the Secretary, through UGS, to the plaintiffs were constitutionally sufficient, the court must examine both the governmental and private interests at issue. *Id.* Specifically, the court must consider the following "three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such

interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335, 96 S.Ct. 893.

### 1. *The Private Interest That Will Be Affected by the Official Action*

■ The Secretary avers that plaintiffs' due process claims must fail because they do not have a protected property interest in the possible receipt of part A Medicare benefits. Rather, an individual only has a protected property interest once the Secretary has determined that he or she is eligible for, and entitled to coverage for the specific home health care services at issue. In so arguing, the Secretary relies on *American Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40, 59–60, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999), in which the Supreme Court held that the plaintiffs did not have a "property interest ... in having their providers paid for treatment that has yet to be found reasonable and necessary." *Id.* at 61, 119 S.Ct. 977.

The Secretary reads *Sullivan* too broadly.[33] Even under *Sullivan*, plaintiffs need not demonstrate that they are in fact entitled to receive benefits in order to successfully demonstrate that they have a protect-

32. The court has considered, but rejected, the Secretary's alternative argument that plaintiffs' claims concerning the Secretary's monitoring and supervision of UGS are barred by the *Heckler/Chaney* doctrine. Specifically, the Secretary has failed to demonstrate how the Secretary's monitoring of UGS is "enforcement" action as contemplated by that doctrine.

33. The claims in *Sullivan* were far different than those raised in this case. Plaintiffs in *Sullivan* sought to have "their providers paid

for treatment that has yet to be found reasonable and necessary." The Supreme Court, of course, rejected that due process claim. "To state the argument is to refute it, for what respondents ask in this case is that insurers be required to pay for patently unreasonable, unnecessary, and even fraudulent medical care without any right, under state law, to seek reimbursement from providers. Unsurprisingly, the Due Process Clause does not require such a result." 526 U.S. at 61, 119 S.Ct. 977.

ed property interest. Rather, the critical issue is whether plaintiffs have a "legitimate claim of entitlement" to the receipt of coverage. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Thus, "the initial question is whether the property interest asserted by the plaintiffs is one to which they have 'a legitimate claim of entitlement' secured by existing laws, rules, or customs, rather than simply 'an abstract need or desire.'" *Heese v. DeMatteis Development Corp.,* 417 F.Supp. 864, 870 (S.D.N.Y.1976), *citing Board of Regents,* 408 U.S. at 577, 92 S.Ct. 2701; *and Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

To be sure, if plaintiffs were disputing the termination of existing Medicare benefits, there could be no dispute that they had a sufficient "legitimate claim of entitlement" to the continued receipt of the benefits.[34] A termination of existing benefits is not, however, necessary to demonstrate a legitimate claim of entitlement to statutory benefits. In other words, although plaintiffs' claims may be "somewhat unusual because [they are] not couched, as are many of the reported cases, in terms of whether [they are] entitled to a hearing before the termination of a benefit [they have] been receiving or before denial of a benefit to which [they are] only arguably entitled," that does not mean they are without due process rights. *Kraebel v. New York City Dept. of Housing Preservation and Development,* 959 F.2d 395, 405 (2d Cir.1992) (recognizing property interest in claimed entitlement under state law

to payment to landlords with senior citizen tenants who were exempt from rent). Rather, "even before the state makes a definitive decision as to entitlement, the road to that determination must be paved by due process." *Id.* The Secretary's unrestrained reliance on *Sullivan* is thus misplaced.

Indeed, in *Sullivan* itself, the Supreme Court, citing to *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430–31, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), noted that the plaintiffs did "not contend that they have a property interest in their claims for payment, as distinct from the payments themselves, such that the State, the argument goes, could not finally reject their claims without affording them appropriate procedural protections." *Sullivan,* 526 U.S. at 61 n. 13, 119 S.Ct. 977. In *Logan,* the Supreme Court, analogizing to the due process accorded civil litigants, held that a state employee's right to use the procedures set forth under the Illinois Fair Employment Practices Act was a property interest protected by the due process clause. *Logan,* 455 U.S. at 430–31, 102 S.Ct. 1148. Thus, the court concluded "the State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement." *Id.* at 434, 102 S.Ct. 1148. That is precisely the nature of plaintiffs' protected property interest in this case, a claim for entitlement to part A coverage.

In the majority of the cases that specifically address the nature of a Medicare

---

**34.** The record does not reflect whether any of the plaintiffs have received past Medicare coverage of the type that would lead them to reasonably expect continued coverage. Arguably, plaintiffs who have this expectation would, by virtue of this expectation, have a protected property interest under the *Eldridge* test. *See, e.g., Healey v. Thompson,* 186 F.Supp.2d 105, 122 n. 13 (D.Conn.2001) (identifying "[t]he private interest affected in

this case [as] the plaintiffs' substantially uninterrupted receipt of Medicare home health care benefits pending an initial determination by the Secretary of an adverse coverage decision rendered by an HHA" and distinguishing *Sullivan* because the plaintiffs previously received Medicare benefits under similar circumstances and had a reasonable expectation of continued receipt of similar benefits).

claimant's property interest, the existence of a protected interest has been assumed with little discussion. *See, e.g., Kraemer v. Heckler,* 737 F.2d 214 (2d Cir.1984) (assuming sub silentio that part A claim was a protected property interest); *see also Schweiker v. McClure,* 456 U.S. 188, 198, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982) ("We may assume that the District Court was correct in viewing the private interest in Part B payments as 'considerable,' though 'not quite as precious as the right to receive welfare or social security benefits.'") (Part B claims); *David v. Heckler,* 591 F.Supp. 1033, 1041 (E.D.N.Y.1984) ("The government does not contest plaintiffs' assertion that their interests in receiving medicare reimbursement are sufficient to invoke due process protections, including notice and an opportunity to be heard.") (Part B claims); *Gray Panthers v. Schweiker,* 652 F.2d 146, 148 n. 2 (D.C.Cir. 1980) ("The defendant Secretary of the Department of Health and Human Services does not dispute that the claimants' interest in receiving the medical insurance benefits for which they have paid a monthly premium is a property interest, and thus that the requirements of due process attach to any final government decision to deny those payments.") (part B claims).

In those few cases that have more specifically addressed the issue, the courts have appeared to define the protected property interest not, as the Secretary does, as continued receipt of benefits. For example, in *Isaacs v. Bowen,* 865 F.2d 468 (2d Cir.1989), the Second Circuit held that the plaintiffs' "private interest lies in the prompt and fair reimbursement of medical expenses covered by Part B." Stated another way, "due process must attach to the process of determining ineligibility, whether at the outset or after receipt of benefits." *Kelly v. Railroad Retirement Bd.,* 625 F.2d 486, 490 (3d Cir.1980); *see also Holmes v. New York City Housing Authority,* 398 F.2d 262, 265 (2d Cir.1968)

(due process required that selections among applicants for public housing "be made in accordance with ascertainable standards, and, in cases where many candidates are equally qualified under these standards, that further selections be made in some reasonable manner ....") (internal quotation and citation omitted); *Perales v. Reno,* 48 F.3d 1305, 1313 (2d Cir. 1995) ("The Fifth Amendment requires that no person be deprived of life, liberty, or property without due process of law. For purposes of our discussion, we assume that plaintiff class members have a protected interest in receiving amnesty based on IRCA's mandatory language that the Attorney General 'shall' grant eligible aliens legalized status."); *cf. Longobardi v. Bowen,* 1988 WL 235576 (D.Conn., Oct.25, 1988) (in examining standing for Section 405(g) appeal of denial of Medicare coverage, the court noted that the plaintiff's decedent's "stake in the outcome of this action is not in receiving a Medicare payment; it is in the distribution of a benefit payment which comprises a portion of her Medicare entitlement."). In short, *Sullivan* in no way alters the unassailable proposition that plaintiffs can possess a protected property interest in a claim for receipt of benefits. *See Sullivan,* 526 U.S. at 61–62, 119 S.Ct. 977 (Ginsburg, J. concurring) ("I join Part III of the Court's opinion on the understanding that the Court rejects specifically, and only, respondent's demands for constant payment of each medical bill, within 30 days of receipt, pending determination of the necessity or reasonableness of the medical treatment. I do not doubt, however, that due process requires fair procedures for the adjudication of respondents' claims for workers' compensation benefits, including medical care.") (internal citations omitted).

Having determined that plaintiffs have a legitimate claim of entitlement to receipt of Medicare Part A coverage, the court

must next examine the nature of this interest. The Secretary correctly notes that the situation of plaintiffs, because they are dually eligible beneficiaries is, by definition, less dire than that of non-dually eligible beneficiaries. This is so because plaintiffs have received the sought-after home health services and such services have been paid for by the Medicaid program. Thus, for example, it is unlikely that any individual plaintiff will be financially crippled by the denial of benefits or the delay in obtaining a final determination of benefits owed.

Plaintiffs do, however, correctly note that, despite the fact that Medicaid has covered the services they have received, members of the plaintiff class do continue to have an individual financial stake in the reimbursement process.[35] Specifically, as this court recognized in certifying the class of plaintiffs, the plaintiffs "have a uniquely personal interest in preventing any potential liens against their estates for unpaid but potentially covered benefits." Although the Secretary dismisses this interest as speculative and inchoate, there is no reason to believe DSS will not do what the law requires and seek recovery from plaintiffs' estates if Medicare coverage is not obtained. *See generally* 42 U.S.C. § 1396p(b)(3); *see also State v. Marks,* 239 Conn. 471, 686 A.2d 969 (1996) (holding that the state can recover from the estate of deceased public assistance beneficiary the full amount of Medicaid payments made on the beneficiary's behalf, even though estate's sole asset was house inherited from beneficiary's son).

Thus, although plaintiffs' protected interest in reimbursement is certainly less compelling than that of non-dually eligible beneficiaries, their interest is more than de minimis and therefore subject to the constraints of procedural due process. *See Gray Panthers v. Schweiker,* 652 F.2d 146, 156 n. 19 (1980) ("The *size* of the interest at stake does not determine whether due process attaches to adjudications concerning the interest, the question is rather the *type* of interest involved and whether it can properly be classified as a liberty or property interest.") (emphasis in original; citing *Goss v. Lopez,* 419 U.S. 565, 576, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)).

### 2. The Probable Value, If Any, of Additional or Substitute Procedural Safeguards

The risk of erroneous deprivation as a result of the current procedures utilized by UGS is clear. First and foremost, if an individual receives no notice of initial de-

---

**35.** DSS also argues that its stake in potential claims is the right to recover Medicare reimbursement for claims paid under the state's medicaid program, and thereby reduce the expenditure of Medicaid money. The Secretary, however, correctly notes that "[t]he word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union, and to our knowledge this has never been done by any court." *State of South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966); *see also New York State Dept. of Social Services v. Bowen,* 661 F.Supp. 1537 (S.D.N.Y.1987) (New York State Department of Social Service's claim that HHS policies violated its Fifth Amendment due process rights was "meritless") (*citing Katzenbach,* 383 U.S. at 323, 86 S.Ct. 803, *rev'd on other grounds,* 846 F.2d 129 (2d Cir.1988)); *but see In re Real Estate Title and Settlement Services Antitrust Litigation,* 869 F.2d 760 (3d Cir. 1989) (school boards are persons within the scope of the Due Process Clause of the Fifth Amendment). It is unclear whether DSS seeks to assert its own due process rights or the rights of the beneficiaries as subrogee. Because the court concludes that the individual class plaintiffs have a protected property interest, and that DSS is entitled to summary judgment on its claims for declaratory and mandamus relief, the court need not decide whether DSS, as subrogee, has protectable due process rights.

termination on a claim, he or she is completely cut off from further review of the claim. *See Grijalva v. Shalala,* 152 F.3d 1115, 1122 (9th Cir.1998), *vacated on other grounds,* 526 U.S. 1096, 119 S.Ct. 1573, 143 L.Ed.2d 669 (1999). Although less dramatic, the same effects flow from inadequate or confusing notices of initial determinations. Finally, although plaintiffs' statistical evidence concerning reversal rates, standing alone, might not be dispositive, *see, e.g., Eldridge,* 424 U.S. at 346–47, 96 S.Ct. 893 ("Bare statistics rarely provide a satisfactory measure of the fairness of a decisionmaking process."), it undoubtedly is relevant in demonstrating the risk of error. Accordingly, the court concludes that UGS's procedures are likely to lead to erroneous deprivations of plaintiffs' protected property interests and that the use of additional or substitute procedural safeguards would eliminate that risk.

### 3. The Government's Interest, Including the Function Involved and the Fiscal and Administrative Burdens That the Additional or Substitute Procedural Requirement Would Entail

The final factor to be considered in determining whether the notices are constitutionally defective is the public interest at stake. *See Eldridge,* 424 U.S. at 347, 96 S.Ct. 893. This factor includes consideration of the fiscal and administrative burden that would be imposed on the government if the additional procedural safeguards sought by the plaintiffs are mandated and the societal impact if the status quo is maintained. *See id.* at 335, 347, 96 S.Ct. 893. Once plaintiffs demonstrate, as they have here, that the challenged government procedures pose an unreasonable risk of erroneous deprivation to a significant private interest, the burden shifts to the government to prove that implementation of additional or substitute procedural safeguards is not in the public interest.

*See Grijalva v. Shalala,* 152 F.3d 1115, 1123 (9th Cir.1998).

The Secretary concludes that the provision of additional safeguards is not in the public interest because it will divert scarce Medicare resources away from other beneficiaries. Specifically, the Secretary argues that providing additional protections, particularly the sending of the MSN to a beneficiary's representative, would be unduly burdensome. For example, the Secretary avers that the current computer automated claim mailing system does not allow for the individual identification of representatives to receive particular MSNs and the redaction of private information before mailing.

Plaintiffs correctly argue, however, that they are asking for no more than for the Secretary to comply with existing regulations. *Fox v. Bowen,* 656 F.Supp. 1236, 1250 (D.Conn.1986) ("[A]lternative procedural safeguards ... will entail no greater 'fiscal and administrative burdens' for the government than are contemplated by the applicable law and regulations."). Moreover, there is at least some merit in the contention that the additional procedures sought by plaintiffs will ultimately resort in additional conservation, not expenditure, of Medicare resources. *See Ford v. Shalala,* 87 F.Supp.2d 163, 184 (E.D.N.Y.1999) ("[T]he record shows that the provision of adequate notice to claimants is likely to conserve the public fisc by avoiding unnecessary administrative proceedings."). In addition, UGS has already demonstrated that it has some degree of flexibility in accommodating plaintiffs' requests and the ability to treat them distinctly from ordinary claims or requests for determinations. For example, UGS entered into an agreement with CMA under which UGS sent a monthly spreadsheet report to CMA. CMA then had sixty days from the date of confirmation of receipt, not the

date when the beneficiary received the MSN, to request reconsideration of an initial determination.

Finally, the Secretary's protestations are somewhat exaggerated because they fail to account for the fact that plaintiffs' claims are but a small portion of: (1) the requests filed by Connecticut dually eligible beneficiaries, (2) the overall Medicare claims handled by UGS and, more generally, (3) the entire Medicare system. Specifically, the Secretary avers that CMA submitted 27,812 requests to UGS on behalf of Connecticut dually eligible beneficiaries between October 25, 1995 and July 14, 2000. UGS handles the claims of only two out of the one hundred HHAs in Connecticut. UGS also services over 9,000 providers in all fifty states. Although the procedures requested by plaintiffs will undoubtedly come with some cost, the costs are not overwhelming and will be incurred in order to bring the Secretary into compliance with his own regulations.

### 4. Conclusion

The court does not wish to overstate the importance of plaintiffs' interests, especially as compared to the dire financial impact many non-dually eligible Medicare beneficiaries would suffer absent coverage. Nonetheless plaintiffs do have a real, nontrivial interest in the receipt of Medicare coverage. Furthermore, UGS's current practices undeniably cause great harm to this interest. Finally, although the burden to UGS and the Secretary is not insignificant, it is clearly outweighed by the benefit to plaintiffs and the potential savings to the system as a whole. Accordingly, the court concludes that UGS's procedures violate plaintiffs' due process rights. *See,* *e.g., Perry v. Chen,* 985 F.Supp. 1197, 1204 (D.Ariz.1996) (existence of regulation requiring notice tips the scales in favor of the private interest).

### F. DO UGS's PRACTICES VIOLATE THE PLAINTIFFS' EQUAL PROTECTION RIGHTS?

■ In their summary judgment papers, plaintiffs argue that the Secretary's current system for handling third-party dually eligible claims impermissibly treats similarly situated beneficiaries differently based upon which intermediary services them. Specifically, plaintiffs aver that they are treated unfavorably because UGS is the RHHI for the HHA rendering the services at issue. Because similarly situated beneficiaries are treated to vastly different procedures, plaintiffs conclude, impermissible differential treatment based on a government-created classification system exists, regardless of the fact that neither the regulations nor the statutes explicitly creates the classifications.

As the Supreme Court succinctly stated in *Mathews v. de Castro,* 429 U.S. 181, 185, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976):

The basic principle that must govern an assessment of any constitutional challenge to a law providing for governmental payments of monetary benefits is well established.... In enacting legislation of this kind a government does not deny equal protection 'merely because the classifications made by its laws are imperfect.' If the classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality.

(internal quotations and citation omitted). "Thus, the question is whether there is a reasonable basis for the difference in the regulatory requirements with respect to the content of notices between the two sets of federal benefit programs referred to in plaintiffs' complaint. A reasonable basis is one that is not arbitrary and that is based upon some ground of difference having a

fair and substantial relation to the object of the [regulation], so that all persons similarly circumstanced shall be treated alike." *Ford v. Shalala*, 87 F.Supp.2d 163, 185–86 (E.D.N.Y.1999) (internal citation and quotation omitted). In short, "once the government's action has been shown to have some plausible rationale, a court's inquiry is at an end." *Id.* at 186 (*citing United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980)).[36]

As a preliminary matter, the court notes that nowhere in the Amended Complaint do plaintiffs explicitly assert an equal protection claim. Furthermore, the Secretary has represented that all of HHS's intermediaries will soon convert to using the MSN. It is unclear whether this would have the effect of mooting some of plaintiffs' equal protection arguments. In any event, even assuming plaintiffs have sufficiently stated a non-moot equal protection claim, the Secretary is entitled to judgment as a matter of law. Specifically, plaintiffs' equal protection argument hinges on the assertion that "[t]he Secretary has taken a class of identically situated Medicare beneficiaries, divided them arbitrarily into two classes based on the irrelevant factor of the identities of their home health agency and intermediary, and then treated them quite differently ...." Pl's Memo. at 37. Thus, plaintiffs conclude, citing to *Logan*, 455 U.S. at 442, 102 S.Ct. 1148, that the Secretary's conduct is "impermissible for the simple reason that 'it draws an arbitrary line between otherwise identical claims.'" The Secretary has, however, sufficiently demonstrated that its decision to allow HHAs to file claims with different intermediaries is not arbitrary.[37] Specifically, the

rationale for permitting an HHA provider chain to choose to file claims with the regional intermediary where the provider has its home office furthers the effective and efficient administration of the Medicare program. Medicare Regional Office Manual at § 6015, Intermediary Elections by Provider Chains. There can be little serious dispute therefore that the Secretary's actions are rationally related to the legitimate purpose of ensuring the effective and efficient administration of the Medicare program. *See, e.g., Furlong v. Shalala*, 156 F.3d 384, 392 (2d Cir.1998) (The Secretary did not violate plaintiffs equal protection rights "[b]y granting assignee-physicians greater appeals rights" than non-assignee-physicians, because distinction was rationally related to legitimate purpose of encouraging physicians to accept assignment, thereby reducing the cost of delivering health care to Part B patients.).

## G. CONCLUSION

For the foregoing reasons, the plaintiffs' motions for summary judgment [docs 45 & 48] are granted in part and denied in part, and the defendant's motion for summary judgment [doc 55] is granted in part and denied in part. The parties shall confer in an effort to draft an agreed upon order to effect this ruling. Any such stipulated form of order shall be submitted to the court no later than September 20, 2002. In the event that the parties are unable to agree upon a form of order, plaintiffs shall submit a proposed order to the court no later than September 27, 2002.

It is so ordered.

---

**36.** Plaintiffs concede that their claim is subject only to the "rational basis test."

**37.** Indeed, plaintiffs asserted in their Amended Complaint, and the Secretary admitted in his Answer, that although "[a]s a general rule,

HHAs in a given region submit their claims to that regional intermediary ... *for administrative convenience,* an HHA is permitted to use the intermediary which handles claims in the region where the HHA has its corporate office." Am. Compl. ¶ 22; Answer ¶ 22.

## ORDER IMPLEMENTING THE RULING ON THE PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT

Following consideration of the parties' cross-motions for summary judgment and supporting documentation, and issuance of the decision of those motions in the Ruling filed September 10, 2002 (doc. # 90),

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

1. Defendant's motion for summary judgment is granted in part and denied in part, plaintiffs' motions for summary judgment are granted in part and denied in part, all as set forth in the Ruling, and judgment shall be entered accordingly.

2. The class of plaintiff beneficiaries, previously certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, with Philip Myrun and Confesora Santiago as the class representatives, is defined as follows: "All residents of Connecticut (1) who are, have been, or become simultaneously eligible for both Medicare and Medicaid coverage, (2) whose home health care providers have had or have as their fiscal intermediary United Government Services ("UGS"), and (3) for whom requests for an initial determination and/or for reconsideration of an initial determination for Medicare coverage of home health case services have been filed or are filed."

3. a. Defendant's policy of failing to issue a written notice of initial determination when a home health agency, after being requested to do so by a beneficiary or by the Connecticut Department of Social Services ("DSS") as subrogee of a beneficiary or by the defendant's intermediary, does not submit a timely, processible claim for Medicare coverage, violates Medicare regulations and the due process clause of the Fifth Amendment and is declared invalid.

b. The defendant, his successors in office, his agents, employees, and all persons acting in concert with him who receive actual notice of this order are hereby permanently enjoined from failing to issue written notices of initial determination in response to all requests for payment filed by or on behalf of plaintiff class members or DSS as their subrogee, regardless of whether the applicable home health agency has submitted a timely and/or complete claim. If the defendant is unable to make a substantive benefits determination for lack of sufficient information from the home health agency, the written notice of initial determination shall state that this was due to the failure of the home health agency to file the claim or to provide the necessary information. The injunctive provisions of this paragraph shall apply to all presently pending and future requests for payment.

4. a. Defendant's policy of sending written notices of initial determination without a regulatory reference and a meaningful explanation of the basis for denial of benefits violates the Medicare statute and the due process clause of the Fifth Amendment and is declared invalid.

b. The defendant, his successors in office, his agents, employees, and all persons acting in concert with him who receive actual notice of this order are hereby permanently enjoined from failing to include within the written notices of initial determination: (1) citation to the regulatory section(s) on which a denial of coverage is based, and (2) sufficient information for the beneficiary to meet the requirements for filing a request for reconsideration; when applicable, this information shall include, but not be limited to, the fact that the provider has not filed a complete and/or timely claim. The injunctive provisions of this paragraph shall apply to all initial determinations (including, but not limited to, Medicare Summary Notices) issued on or after April 1, 2003.

5. a. Defendant's policy of failing to send a copy of the written notice of initial determination to the beneficiary's known representative violates the Medicare regulations and the due process clause of the Fifth Amendment and is declared invalid.

b. The defendant, his successors in office, his agents, employees, and all persons acting in concert with him who receive actual notice of this order are hereby permanently enjoined from failing to send a copy of each written notice of initial determination to the beneficiary's known representative. The injunctive provisions of this paragraph shall apply to all written notices of initial determination (including, but not limited to, Medicare Summary Notices) issued on or after February 1, 2003.

6. This order is judicially enforceable, and the court shall retain jurisdiction to monitor implementation of and to enforce this order.

7. Plaintiffs shall recover their costs of this action, and may file a motion for an award of attorneys' fees and expenses.

It is so ordered.

### RULING ON THE DEFENDANT'S MOTION FOR RECONSIDERATION

Tommy G. Thompson, the Secretary of Health and Human Services, has moved for partial reconsideration of the court's January 8, 2003 Order Implementing the Ruling on the Parties' Cross–Motions for Summary Judgment (doc. # 101). The motion argues principally that the court should not reach the constitutional issues in this case because there is an adequate regulatory basis for the court's decision. For the following reasons, the motion for reconsideration (doc. # 102) is denied.

Initially, it is worth noting that the motion for reconsideration was filed months late. Under Local Rule of Civil Procedure 7(c) (formerly Rule 9(e)), motions for reconsideration must be filed within ten days of the filing of the decision or order from which relief is sought. The motion facially seeks reconsideration of the *order* implementing the court's ruling on cross-motions for summary judgment, which was filed less than ten days before the motion for reconsideration. The motion for reconsideration, however, actually addresses the *decision* of the constitutional issues in this case.[1] That decision was made and filed by the court on September 10, 2002; the order implementing that decision simply incorporated by reference the September 10, 2002 decision's analysis of the constitutional issues that are the subject of the motion for reconsideration. Thus, any motion for reconsideration of the court's decision of the constitutional issues should have been filed last September. Notwithstanding the late filing of the motion for reconsideration, the court will reach the merits of the motion.

As the defendant notes, the standard for granting a motion for reconsideration is "strict." A motion for reconsideration "is not simply a second opportunity for the movant to advance arguments already rejected." *Shrader v. CSX Transportation, Inc.*, 70 F.3d 255, 257 (2d Cir.1995). Here, the defendant is expanding upon an argument previously raised. The defendant made reference to the argument now contained in his motion for reconsideration during a November 15, 2002 telephone conference with the court and raised it again, albeit briefly, in the defendant's December 13, 2002 Objections to Plaintiff-Beneficiaries' Proposed Order (doc. # 98)

---

1. Indeed, the defendant notified the court of his intention to move to reconsider the court's decision of the due process issues in a November 15, 2002 telephone conference, i.e., nearly two months *before* the order implementing the decision on the cross-motions for summary judgment was issued.

(arguing that it is "unnecessary and inappropriate for the Court's order to reference due process"). The court rejected that argument. Although defendant has now briefed the issue fully, that briefing does not raise an argument that the court overlooked. At the time it entered the order, the court was fully aware of the general principle that courts should avoid reaching constitutional issues when doing so is unnecessary to decision of matters before them. Accordingly, because the principle now raised by the defendant was both previously raised by the defendant and previously known to the court, the defendant has failed to meet the threshold requirement for a motion for reconsideration under Rule 59(e) of the Federal Rules of Civil Procedure.

In addition, the court declines to exercise its discretion to reconsider the order or the underlying decision. The fundamental premise of the cases cited by the defendant is that the court should exercise discretion to avoid reaching constitutional issues that are unnecessary to its decision. Here the constitutional issues reached in the decision are quite necessary to the court's ruling. The defendant has the authority to rewrite the regulations that were litigated, at great expense and over a significant period of time, during the pendency of this case. Were the court to eliminate the alternative, constitutional basis for its ruling, the defendant would have the power to moot the ruling of the court and thereby render meaningless both the order and the underlying efforts that the parties and the court expended in this case. Under these unique circumstances, retention of the court's alternative basis of decision is necessary to preserve the vitality of the ruling. The defendant, of course, remains free to amend the pertinent regulations notwithstanding the ruling and order in this case; he is precluded only from amending them in a way that violates the due process rights of the plaintiffs, as set forth in the ruling and order.

Accordingly, the defendant's motion for partial reconsideration (doc. # 102) is denied.

It is so ordered.